KEVIN WEIDLING, RICHARD MAHON, JANET PETITIO, JOSEPH RUSSO, WALTER T. KEHOE, AND F. PATRICK KEDIAN, PLAINTIFFS, v. THE BOROUGH OF MANVILLE, A MUNICIPAL CORPORATION IN THE COUNTY OF SOMERSET, STATE OF NEW JERSEY, DEFENDANT.

Superior Court of New Jersey
Law Division—Somerset County

Decided December 12, 1979.

*Lieberman & Ryan* for plaintiffs (*Thomas R. Ryan* appearing, *Marvin S. Lieberman* on the brief).

*Henry E. Rzemieniewski* for defendant.

IMBRIANI, J. S. C.

This is a motion for summary judgment seeking to compel the Borough of Manville which owns and operates a water supply

system to charge the same rates to out-of-town users as it charges its own residents. Out-of-town users pay about double the rates charged to Manville residents.

The out-of-town users claim that *N.J.S.A.* 40:62 85.2 (enacted February 8, 1979) requires defendant to charge everyone the same rates. Manville contends that the water rates are determined by an existing contract and the Legislature cannot constitutionally impair its obligations.

Manville supplies water not only to its own residents but also to two residential developments in the adjoining Township of Hillsborough. Several decades ago Manville contracted with building contractors, the predecessors in title to plaintiffs' land, to supply water to the Hillsborough developments for a term of 25 years. One contract was entered into on January 1, 1956 and covered a development commonly known as Village Green. The other contract was entered into on December 28, 1960 and covered a development commonly known as Green Hills. The former contract will expire December 31, 1981 and the latter December 27, 1985.

Both contracts provide that the water rates "may, at the option of the Borough, be revised from year to year on the basis of operating costs, provided, however, that said rate shall not at any time be less than the rate of seventy (70¢) cents per thousand gallons."

In addition, every Hillsborough homeowner is required to pay Manville a water connection deposit of $25, which bears no interest and "will not be assignable by the depositor". The deposit may be used to pay for any delinquency, maintenance charges, or damage committed by the user.

*N.J.S.A.* 40:62 85.2 exempts a municipal water system from the jurisdiction and control of the Board of Public Utilities if "the sale of water outside of its boundaries does not exceed 25% of its total water revenue" and it supplies "water to 1,000 or less billed customers" outside of its boundaries. Manville is exempt since both conditions exist. The focus of this dispute is on that

portion of the statute which directs that when such exemption exists

> . . . [t]he rates charged to the billed customers within any other municipality shall be the same as those charged to customers within the supplying municipality.

Hillsborough residents have always paid a substantially higher charge for their water than have Manville residents. For instance, during the first year of each contract Manville residents were charged 35¢ a thousand gallons of water, while Hillsborough residents were charged 70¢ a thousand, or 100% more.

Manville now has a graduated rate schedule with different rates for senior citizens and nonsenior citizens. And the rate disparity continues. For instance, on the first 6,000 gallons used, Hillsborough senior citizens are charged 130% more than Manville senior citizens (58¢ as against $1.36 a thousand), and Hillsborough nonsenior citizens are charged 80% more than those of Manville (75¢ as against $1.36 a thousand).

Plaintiffs say that since a municipality is a creature of the state its policy must yield to that of the State as expressed in the statute. Manville argues that it has a firm and binding contract with plaintiffs and the State may not constitutionally impair the obligations of such contract. As to the deposit requirement, it notes that Manville may impose a lien through its tax office upon Manville users who attempt to avoid their obligation to pay for water or who damage water facilities. But there is no equivalent lien to enforce against out-of-town water users, which is why a deposit is required.

The New Jersey Constitution (1947) provides that the ". . . Legislature shall not pass any . . . law impairing the obligation of contracts." *Art.* IV, § VII, *par.* 3. The United States Constitution has a similar clause. *Art.* I, § 10, *cl.* 1. Our courts will enforce both guarantees. *P. T. & L. Constr. Co. v. Transportation Dep't Comm'r,* 60 *N.J.* 309 (1972).

The purpose of the federal and state clauses is to make contracts inviolate from state action and thereby strengthen the confidence of our citizens in its sanctity. Our forefathers believed that "one legislative interference is but the first link of a long chain of repetitions, every subsequent interference being naturally produced by the effects of the preceding." *The Federalist Papers*, No. 44. And in the famous case of the *Trustees of Dartmouth College v. Woodward*, 17 *U.S.* (4 *Wheat.*) 518, 525, 4 *L.Ed.* 629, 657 (1819), which struck down a state statute because it impaired the obligations of a contract, Chief Justice Marshall commented that prior to the adoption of the Constitution

> . . . a course of legislation has prevailed in many, if not in all, of the states, which weakened the confidence of man in man, and embarrassed all transactions between individuals, by dispensing with a faithful performance of engagement.

It was to curb state interference with contracts and "to encourage trade and credit by promoting confidence in the stability of contractual obligations" that the Impairment of Contract Clauses ensued. *U. S. Trust Co. of New York v. New Jersey*, 431 *U.S.* 1, 15, 97 *S.Ct.* 1505, 1514, 52 *L.Ed.2d* 92, 105 (1977).

There exists no genuine dispute of the facts and the function of the court is to dispose of the case in a summary fashion by determining the law to be applied to such facts. *Judson v. Peoples Bank & Trust Co. of Westfield*, 17 *N.J.* 67, 73 75 (1954); R. 4:46.

■ First, does a contract exist here? Plainly, one does. As stated in *Daniel v. Oakland*, 124 *N.J.Super.* 69, 72 (App.Div. 1973), "[c]harges by a municipality for water furnished to its customers involve a sale and arise from a contractual relationship between it and the customer."

But not every action that affects a contract is proscribed. Only those that "impair" the obligations of contract. Equality of rates could be accomplished without affecting this contract, *i. e.*, by raising the rates charged Manville residents to equal those

charged plaintiffs. But since there may be practical impediments to such action, the court will assume that the only practical way to obtain equal rates would be to reduce the rates charged Hillsborough residents. Patently, to compel a reduction in rates, especially one as substantial as this, would result in the impairment of the obligations of this contract. *Home B. & L. Ass'n v. Blaisdell*, 290 *U.S.* 398, 437-8, 54 *S.Ct.* 231, 239, 78 *L.Ed.* 413 (1934).

But do the Impairment of Contract Clauses apply where one of the parties to the contract is a subdivision of the State? Since "[t]he powers of a New Jersey municipality are wholly derivative from state statute," *West Point Island Civic Ass'n v. Dover Tp. Comm.*, 54 *N.J.* 339, 345 (1969), and it is "but the creature of the state, and exists at its pleasure", *Wagner v. Newark*, 24 *N.J.* 467, 474 (1957), does the State have the right to alter or void contracts made by a municipality? The New Jersey Constitution commands that "[t]he provisions of this Constitution and of any law concerning municipal corporations formed for local government, or concerning counties, shall be liberally construed in their favor." *Art.* IV, § VII, *par.* 11.

The question is no longer open to dispute. It is now well established that contracts between the State, or its subdivisions, and individuals are "within the protection of Article I, sec. 10." *Indiana v. Brand*, 303 *U.S.* 95, 100, 58 *S.Ct.* 443, 446, 82 *L.Ed.* 685, 690–691 (1938). Hence, an ordinance which retroactively raised rates charged by a municipal water system was nullified because it impaired the obligation of contracts. *Daniel v. Oakland, supra.* See, also, 16 *C.J.S. Constitutional Law* par. 285.

Nonetheless, plaintiffs say that the State has the inherent power to alter and even abrogate existing contracts under its "police powers." Clearly, every contract is subject to the State's never abdicated police powers to protect the health, morals, safety and general welfare of the public and is made subject to the implied condition that its fulfillment may be

frustrated by a proper exercise of the police power. *McMullen v. Conforti & Eisele,* 67 *N.J.* 416, 418 (1956).

But is a statute requiring a municipal water system to charge the same rates for water to all customers, whether they reside within or without the municipality, within the police power of a state?

There is no clear and definitive statement of what constitutes the "police powers" of a state, so it is sometimes "difficult to fix boundary stones between the private right of property and the police power." *Hudson Cty. Water Co. v. McCarter,* 209 *U.S.* 349, 28 *S.Ct.* 529, 531, 52 *L.Ed.* 828 (1908).

The exercise of the police power is a legislative function and it must be exercised to protect or enforce some public good. It must bear a reasonable relationship to the purposes it seeks to accomplish and may not be exercised in an arbitrary and capricious manner. And "[w]hile this power is subject to limitations in certain cases, there is wide discretion on the part of the legislature in determining what is and what is not necessary—a discretion which courts ordinarily will not interfere with". *Hourigan v. North Bergen Tp.,* 113 *N.J.L.* 143, 149 (E. & A.1934).

█ It is well established that the police powers extend to utility rates. In *Midland Realty Co. v. Kansas City Power & Light Co.,* 300 *U.S.* 109, 57 *S.Ct.* 345, 81 *L.Ed.* 540 (1937), a statute sought to supersede steam heating rates already fixed by an existing contract. The court held that the statute did not violate the Contract Clause of the Constitution or the Due Process Clause of the Fourteenth Amendment because a "state has power to annul and supersede rates previously established by contract between utilities and their customers." The exercise of a state's "police power" is not limited to health, morals, safety and general welfare but "extends to economic needs as well, [and] utility rate contracts [must] give way to this power." *Veix v. Sixth Ward B. & L. Ass'n of Newark,* 310 *U.S.* 32, 39, 60 *S.Ct.* 792, 795, 84 *L.Ed.* 1016, 1066 (1940).

In addition to concern for the "economic needs" of our citizens the Legislature, in decreeing equal water rates, may well have been motivated by a concern that the rates charged out-of-town residents could become excessive and, if this were to occur, some citizens might be confronted with the prospect of having to do with less water than they need (or perhaps none), thereby creating a danger to their health and general welfare.

The Legislature in its wisdom has sought to compel nondiscriminatory rates—a purpose sanctioned by *Midland Realty Co. v. Kansas City Power & Light Co., supra*, which asserted that the Missouri Public Utilities Commission, when setting steam heating rates, "has power to require service [to all users] at nondiscriminatory rates." 300 *U.S.* 109, 113, 57 *S.Ct.* 345, 347, 81 *L.Ed.* 540, 544 (1937).

Very analogous to this case is *Duff v. Trenton Beverage Co.*, 4 *N.J.* 595 (1950), which held that a contract to sell rum at a price that was less than that established by the Alcoholic Beverage Commission was unenforceable and not protected by the Contract Clause in our Constitutions because "[p]rice control to serve the common interest is a permissible exercise of the police power where the business is affected with the public interest."

The business of selling water clearly involves a business affected with a public interest, and setting the price at which water may be sold is a legislative function within the police power. Accordingly, the rates for water charged plaintiffs and all other out-of-town residents shall be the same as those charged Manville residents.

The imposition of the $25 deposit stands upon a different footing. The statute does not specifically address itself to deposits and the reasons advanced by defendant for its use are fair and reasonable.

Judgment shall be entered in favor of plaintiffs on the count demanding equality of water rates and in favor of defendant on the count dealing with the deposits. To the extent that the Manville ordinance conflicts with this decision it is nullified and set aside.